### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

IN RE LETTER OF REQUEST       )
FROM RUSSIA                   )
IN THE MATTER OF              )        Misc. No. 06-
EVGENY ADAMOV                 )

### GOVERNMENT'S MEMORANDUM OF LAW
### IN SUPPORT OF APPLICATION FOR ORDER

This memorandum of law is submitted in support of the Application for an Order pursuant to Title 28, United States Code, Section 1782, in order to execute a letter of request from Russia. A copy of the translation is attached.

FACTUAL BACKGROUND:

This investigation is being conducted by the Russian authorities who are investigating a case of alleged misappropriation of government funds.

EVIDENCE SOUGHT:

The Russian authorities seek information about a company that may reside in this District and the Delaware Secretary of State's Office. The authority for this Court to accede to this request is contained in Title 28, United States Code, Section 1782, which states in part:

> (a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the

court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

The proper criteria for determining whether the court should exercise its discretion in favor of executing the request are outlined in <u>In Re Request for Judicial Assistance from the Seoul District Criminal Court</u>, 555 F.2d 720, 723 (9th Cir. 1977) (citation omitted):

> Under the statute the only restrictions explicitly stated are that the request be made by a foreign or international tribunal, and that the testimony or material requested be for use in a proceeding in such a tribunal.... [and] that the investigation in connection with which the request is made must relate to a judicial or quasi-judicial controversy.

Moreover, "(t)he judicial proceeding for which assistance is sought ... need not be pending at the time of the request for assistance; it suffices that the proceeding in the foreign tribunal and its contours be in reasonable contemplation when the request is made." <u>In Re Letter of Request from the Crown Prosecution Services of the United Kingdom</u>, 870 F.2d 686, 687 (D.C. Cir. 1989).

The letter of request in this case shows that the information sought is for use in such proceedings in Russia and

hence the request comes well within those circumstances contemplated by Congress in expanding the Federal Courts' authority to act in such matters. *In Re Letter of Request from the Crown Prosecution Service of the United Kingdom*, 870 F.2d 686, 689-91 (D.C. Cir. 1989); *In Re Letters Rogatory from the Tokyo District, Tokyo, Japan*, 539 F.2d 1216, 1219 (9th Cir. 1976). Therefore, I ask this Court to honor the request for assistance.

The reception of letters of request and the appointment of a Commissioner to execute them are matters customarily handled *ex parte*, and persons with objections to the request raise those objections by moving to quash any subpoenas issued by the Commissioner. *Id.*

**WHEREFORE**, the United States requests that the Court issue an Order, in the form, appended hereto, appointing a Commissioner in order to execute the request for assistance.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

BY: *Richard G. Andrews*
Richard G. Andrews
Assistant U.S. Attorney
Delaware Bar I.D. No.2199
1007 N. Orange Street
Wilmington, DE  19801
(302) 573-6277

Dated: 8/25/06

| | |
|---|---|
| The Procurator General's Office<br>of the Russian Federation | The U.S. Department of Justice |

15A Bolshaya Dmitrovka
Moscow, GSP-3, 125993, Russia

27.09.2005 Our ref. 18/195004c-00

**Request for legal assistance
in criminal case
No. 18/195004c-2000**

**Dear Sirs,**

     The Procurator General's Office of the Russian Federation presents its compliments to the U.S. Department of Justice, expresses its gratitude for the co-operation in legal matters and has the honor to kindly request your legal assistance in the criminal case instituted in respect of a Russian national, Mr. Adamov, Evgeny Olegovich.
     The Department for Investigation of Major Cases of the Prosecutor General's Office of the Russian Federation is inquiring into criminal case No. 18/195004c-00. It has been established by the preliminary investigation that Mr. E.O. Adamov, whilst holding the position of the Minister for Nuclear Power of the Russian Federation from March 1998 to March 2001, conspired with a number of persons to misappropriate funds due to the Federal Budget of the Russian Federation under the Agreement between the Russian and U.S. Governments on use of a highly enriched uranium recovered from nuclear weapons dd. 18th January 1993 (VOU-NOU Agreement).
     Between August 1998 and December 1999, Mr. E.O. Adamov, being a member of an organized criminal group including Mr. V.D. Pismenny, ex-director of the Federal State Unitary Enterprise "State Scientific Center 'Troitsky Institute for Innovation and Thermonuclear Research'", Mr. A.G. Chernov, President of the Russian and U.S. company "Globe Nuclear Services and Supply, Limited" (GNSS), and other identified and non-identified persons, arranged fraudulent misappropriation by them of the controlling shareholding in GNSS previously owned by State organizations the Ministry for Nuclear Power had control over. He later managed to involve the company in implementation of the VOU-NOU Agreement on the conditions jeopardizing this major disarmament instrument, which may result in loss of the Federal Budget means exceeding US$1 billion.
     As a result of illegal actions of Mr. E.O. Adamov and his fellow-conspirators, the debt of GNSS equaling US$113 million to a foreign trade organization of the Russian Ministry for Nuclear Power, the 100% shareholding in which passed into the federal ownership, was written off.
     On 13th May 2005, a Resolution on making Mr. Adamov, Evgeny Olegovich, born 28th April 1939, native of the city of Moscow, national of the Russian Federation, answerable as an accused of the offences stipulated by Art. 159 part 4 and Art. 285 part 3 of the Criminal Code of the Russian Federation (Enclosure) was issued.

Moreover, in the course of the preliminary investigation it was established that the incorporator of GNSS was "Nuexco Exchange AG" (NEAG) which was a part of "Concord" group of companies belonged to the U.S. national Oren L. Benton (in 1998 he lived at the following address: 1701 Wynkoop Street, Suite 250, Denver, Colorado 80202).

According to the information received during the investigation the office of GNSS is located in the territory of the United States of America at: 3 Bethesda Metro Center, Suite 910, Bethesda, MD 20814, as well as following companies' offices: TKST (West Chester, PA, 19380), TEXI (registered in the State of Delaware – it is necessary to establish the exact address), KNV (1201 Market Street, Suite Wilmington, Delaware 19899) which during the period from 1998 up to the present have been holding the shares of GNSS.

In view of the above I respectfully ask you to obtain from the mentioned firms and send to the Prosecutor General's Office of the Russian Federation:

All Minutes of the Board of Directors Meetings of GNSS since 5th July, 1991, i.e. the date of incorporation, and up to the present;

All Minutes of the Paticipants' General Meetings of GNSS since 5th July, 1991, i.e. the date of incorporation, and up to the present;

Documents related to the appointment to the positions of GNSS Directors, since 5th July, 1991, i.e. the date of incorporation, and up to the present;

All annual accounting balances of GNSS since 5th July, 1991, i.e. the date of incorporation, and up to the present;

Documentation concerning the allocation of income (dividends) which has been gained as a result of activity of GNSS since 5th July, 1991, i.e. the date of incorporation, and up to the present, including resolutions on distribution of profits and payment documents on its transfer specifying concurrently the names of recipients;

Correspondence (letters, faxes, e-mail messages) both outgoing and incoming for the period from 1996 to 2000 inclusive concerning the sale of 49% of GNSS shares belonged to NEAG, as well as their purchase by TKST Company along with correspondence between GNSS and Ministry for Nuclear Power, its Chiefs and employees, Mr.E.O.Adamov, Mr.V.D.Pismenny, relatives of the latter, Sergey Akimenko, TKST, TEXI;

Correspondence (letters, faxes, e-mail messages) both outgoing and incoming for the period from 1999 to 2000 inclusive concerning the sale of 13% of GNSS shares by TKST Company along with correspondence between GNSS and Ministry for Nuclear Power, its Chiefs and employees, Mr. E.O. Adamov, Mr. V.D. Pismenny, relatives of the latter, Sergey Akimenko, employees of Tekhsnabexport, TKST, TEXI;

All documentation related to the further transfer of 49% of GNSS shares from TKST company to TEXI company in 2000 together with correspondence between GNSS and Ministry for Nuclear Power, its Chiefs and employees, Mr.E.O.Adamov, Mr.V.D. Pismenny, relatives of the latter, Sergey Akimenko, TKST, TEXI;

Documents concerning the conclusion of the agreement on remission of debt of 31st December 1991 between GNSS and Tekhsnabexport together with all decisions made in respect of this matter in GNSS, correspondence with Tekhsnabexport and third persons, including Mr.E.O.Adamov, powers-of-attorney granted to the persons who signed the agreement on remission of debt on behalf of GNSS;

All documents including the correspondence, the Minutes of the Meetings and so on concerning the relations of GNSS participants, i.e. the following companies TKST, TEXI, KNV, with Mr.V.D. Pismenny, Mr.E.O.Adamov, Mr.R.G. Faishtut, Mr.V.G. Vinogradov, Mark Kaushansky, "Omeca Ltd.", "Aglosky", "Energopool Pennsylvania", "Energo Pool Delaware", "Energopool Russia" and "NIKIET Russia".

Financial documents on payments made between the companies GNSS, TKST, TEXI, KNV and Mr.V.D.Pismenny, Mr.E.O.Adamov, Mr.R.G.Fraishtut, Mr.V.G.Vinogradov, Mark Kaushansky, "Omeca Ltd.", "Aglosky", "Energopool Pennsylvania", "Energo Pool Delaware", "Energopool Russia" and "NIKIET Russia".

Correspondence between GNSS and TKST, TEXI, KNV.

All documents which allow to establish the final owners of the following companies: TKST, TEXI, KNV, GNSS.

All documents related to the participation of GNSS, its Directors and employees or its final owners in discussion inter alia with Chiefs and employees of the Ministry for Nuclear Power and in concordance of terms of the Western Contract of 24th March 1999 including the provisions about the persons authorized to sell natural constituent of the NOU (low enriched uranium).

All documents concerning the conclusion of the Contract between GNSS and Tekhsnabexport JSC of 31st January 2000 (Contract GNSS-TENEX) including all decisions made in respect of this matter, correspondence between GNSS and Tekhsnabexport, the Ministry for Nuclear Power, TKST, TEXI, KNV with Mr.V.D.Pismenny, Mr.E.O.Adamov, Mr. R.G. Fraishtut, Mr. V.G. Vinogradov and Mark Kaushansky.

All documents related to the participation of GNSS, its Directors and employees or final owners in discussion inter alia with Chiefs and employees of the Ministry for Nuclear Power and in concordance of terms of Enclosure No. 4 to the Western Contract of 16th November 2001, along with all decisions made in respect of this issue, correspondence between GNSS and Western companies, Tekhsnabexport, the Ministry for Nuclear Power, persons who held the positions there, TKST, TEXI, KNV with Mr.V.D.Pismenny, Mr.E.O.Adamov, Mr.R.G.Fraishtut, Mr.V.G.Vinogradov, Mark Kaushansky.

All documents related to the participation of GNSS, its Directors and employees or final owners in discussion inter alia with Chiefs and employees of the Ministry for Nuclear Power and in concordance of terms and conclusion of Enclosure No.4 to the Contract GNSS-TENEX of 19th December 2001 along with all decisions made in respect of this issue, correspondence with Tekhsnabexport, Ministry for Nuclear Power, persons who held the positions there, TKST, TEXI, KNV with its Chiefs and Mr.V.D.Pismenny, Mr.E.O.Adamov, Mr.R.G.Fraishtut, Mr.V.G.Vinogradov, Mark Kaushansky.

All documents proving the existence of the natural uranium of the Russian origin on the material accounts of GNSS opened by the latter with the "Concentrating Corporation of the United States of America" (YUSEK) in accordance with the agreements on storage and registration of the uranium or similar agreements, as well as the ones containing the information on sources from which GNSS received such natural uranium, along with the documentation reflecting the flow of material on the accounts of GNSS from 1st January 2001 up to the present (such as orders on conducting accounts operations, copies of YUSEK confirmation on transfer of the natural uranium from account/accounts of GNSS to the account/accounts of GNSS.

All documents related to the transfer of location of GNSS from Switzerland to the USA in 2003.

Documents dealing with the passing of a decision by the managerial bodies of GNSS on filing complaint against Tekhsnabexport by GNSS and initiation of the litigation in the Arbitrage in Stockholm and the State Courts of the USA.

Besides, I kindly ask you to interrogate the President of GNSS, Mr.Chernov, Alexander Georgievich, (1201 Market Street, Suite Wilmington, Delaware 19899) as to the following matters:

What do you know about the following companies: GNSS, TKST, TEXI, KNV? What activity do they carry out? Who controlled them and who controls them now? In what way are they connected with the implementation of the VOU-NOU Agreement and contracts related to it?

Do you have the U.S. Citizenship? Do you have the Citizenship of the Russian Federation? What are the grounds of your residence in the USA?

Do you hold any position in GNSS? Did you hold any post in GNSS before? Which and when?

When was the company set up? Who were the founders of the company? What were the aims of company's setting up? Were the aims of GNSS changed later? By whom? When?

What kind of changes have occurred among the shareholders of the company since 1991 up to the present?

What companies are the shareholders of GNSS now?

What managerial bodies exist in GNSS? Who holds the positions in these bodies? Who do these persons give the report to (who controls them)?

Who (the natural persons) are the final owners of GNSS, i.e. actual owners of the company? Are there the following persons among the final owners of the company: Mr.E.O.Adamov, his relatives or companies belonged to him? Is the company "Omeca Ltd" among the final owners?

Tell us about the entrepreneurial activity of GNSS? What has been the main business activity of the company since its setting up? What kind of business is the company carrying out now?

What is the role of GNSS in implementation of the Agreement between the Russian and U.S. Governments on use of highly enriched uranium recovered from nuclear weapons (VOU-NOU Agreement)? Did GNSS conduct the realization of the natural uranium constituent of the low enriched uranium (NC NOU) passed to the ownership of the Russian Federation in the territory of the USA? When did GNSS start the realization of NC NOU? On the basis of which contracts did GNSS get NC NOU? What organization were the contracts made with?

Did GNSS act in its own interests or for the sake of the Russian Party of the VOU-NOU Agreement, i.e. the Government of Russia, the Ministry for Nuclear Power of Russia, while realizing NC NOU?

Are you acquainted with Mr. Adamov, Evgeny Olegovich? Under what circumstances did you get acquainted with him? What issues did you have to discuss with Mr.E.O.Adamov? Tell us about all meetings and talks with him which have been held since 1998 and up to the present.

Do you know Mr. Fraishtut, Revmir Georgievich, What issues did you have to discuss with Mr. Fraishtut? Tell us about all meetings and talks with him which have occurred since 1998 and up to the present. Did you have any common commercial projects with Mr. Fraishtut?

Under what circumstances did you get acquainted with Mr.V.D.Pismenny, Vyacheslav Dmitrievich? Who introduced Mr.V.D.Pismenny to you? In what character did he act? What issues did you have to discuss with Mr.V.D.Pismenny? Did you have any common commercial projects with Mr. V.D. Pismenny? When did you communicate with Mr.V.D.Pismenny for the last time?

What relations did you have to KNV the legal address of which is registered at place of your permanent residence?

Who are the shareholders of TKST, TEXI and who were the stockholders of the above companies during the different periods of time? Who controls the company? Who were the actual owners of the company during different periods of time including September 1998?

When was TKST established and by whom?

Was TKST, which acquired 49% of GNSS shares on the auction on the sale of bankruptcy assets of "Nuexco Exchange", the subsidiary of the Federal State Unitary Enterprise "State Scientific Center 'Troitsky Institute for Innovation and Thermonuclear Research'" or a private American company?

Was there any opportunity to transfer 49% of GNSS shares after the bankruptcy of one of its co-owner, i.e. NEAG, in favor of other GNSS participant, i.e. Tekhsnabexport, JSC?

Did you or your representatives deal with acquiring of 49% of GNSS shares on the auction? In the interests of whom did you act?

Do you know in what way the decision on acquisition of 49% shares by TKST and later by TEXI was made? What written documents concerning the matter exist?

Were there alternative ways of gaining of 49% of shares? If yes, then what? What were the reasons of refusal of Tekhsnabexport, JSC to acquire the shares independently and/or through Internexco?

What were the conditions of gaining of 49% of GNSS shares by TKST? In what way did you find out about them (meetings, fax and e-mail messages/mail, speaking (by cellar, home, working phone)? Who knew about these arrangements (attended at the meetings, received copies of correspondence etc.)?

In what way was the process of acquisition of 49% of shares by TKST held? How did the Ministry for Nuclear Power (Tekhsnabexport) and you distribute the duties? Who held the negotiation with other creditors (bankruptcy administrators)?

Who conducted the legal maintenance of transactions (who hired them and paid the service rendered)?

Who was the contact person in relations with other participants?

In the interests of whom and why did TKST have to carry out the management of the mentioned shares?

How did TKST handle the shares? Why? Who are the owners of the shares today?

Under what circumstances did TKST get 13% of GNSS shares?

What do you know about the reasons of this block of shares transfer from PPGKhO (the Priargunskoe Industrial Mining and Chemical Union) to TKST, the private American company?

In the interests of whom did TKST conduct the governance of said shares? What were the reasons?

In what way did TKST handle the shares? Why? Who are the owners of the shares today?

Did you sign the Agreement on Remission of Debt between Tekhsnabexport and GNSS? What is this document about? Tell us about the aim of the document signing. When was this document signed?

Who did you hold the negotiations in Russia concerning the signing of this document with? Who was the initiator of the document's signing? Did you discuss signing of this document in the Ministry for Nuclear Power of Russia? Did you make any arrangements or receive any instructions from the Russian Ministry for Nuclear Power about the signing of this document? Do you know whether the Director General of Tekhsnabexport discussed, adjusted or received any instructions from the Ministry for Nuclear Power of Russia in regard to the signing of this document?

Who was interested in signing of the document: Tekhsnabexport or other shareholders of GNSS? How did this document correspond to the interests of Tekhsnabexport?

Were other documents signed concerning the GNSS debt before "Tekhsnabexport" prior to signing of the Agreement on Remission of Debt between GNSS and Tekhsnabexport? What documents were they? [the matter concerns of a number of Agreements on Debt Subordination. Under the provisions of these Agreements the GNSS's debt before Tekhsnabexport was referred to the last priority of recovery]?

A number of Agreements on Debt Subordination were signed between GNSS and Tekhsnabexport. What influence did they have on financial state and bookkeeping of GNSS?

Did you participate in talks regarding conclusion of the contracts between GNSS and Tekhsnabexport of 31st January 2000?

Who was an initiator of the contracts' conclusion?

Did any other companies pretend to make such contract? What is your opinion on the fact that GNSS was the only candidate for contract's conclusion? Why was not the competition on conclusion of the contract held?

What profit did GNSS gain from the fulfillment of this contract? In what way was the profit obtained? How was the income distributed? Who passed the appropriate decisions?

Did you take part in the negotiations concerning conclusion of Additional Agreement No.004 to the contract between Tekhsnabexport and the Western Companies?

Did you discuss with anyone from Tekhsnabexport or the Western Companies the need to amend the provisions of the contract about the person controlled by Tekhsnabexport?

Did you take part in the negotiations concerning conclusion of Additional Agreement No.004 to the contract between GNSS and Tekhsnabexport?

What aims did the conclusion of this addition pursue?

Who did you hold the talks in Tekhsnabexport concerning this addition with?

Was this addition arranged with anyone in the Ministry for Nuclear Power?

Moreover, I ask you to interrogate Oren L. Benton as to the following issues:

What is your current place of work and position?

Were you the owner of the companies that formed Concord group or did you have shares in these companies? Was the Swiss company NEAG included in the said group of companies?

What kind of business relations existed between NEAG and Tekhsnabexport?

What kind of business relations were between NEAG and GNSS?

Did the companies of Concord group concluded contracts on supply of the uranium production, after setting up of GNSS, directly with GNSS or Tekhsnabexport?

Who did the Concord companies have to pay the uranium production upon its receipt under the contracts between Concord and GNSS to?

Who was the actual recipient (GNSS or Tekhsnabexport) of the payments for the uranium production delivered under the contracts between the companies of Concord group and GNSS?

Did you know that GNSS bought the production under the incident contracts from Tekhsnabexport and paid it from the funds received under the contracts with companies of Concord group?

How was GNSS established? Did NEAG have a share in GNSS? What were the aims of GNSS's setting up?

What were the reasons of distribution of the GNSS authorized capital in the following proportion: 49% - NEAG, 51% - Tekhsnabexport?

Which of the companies of the founders had more rights for management of the GNSS activity?

After the bankruptcy of NEAG its block of shares was transferred to Tekhsnabexport, wasn't it? Can you confirm that Tekhsnabexport, rather than other persons, was interested in control over the GNSS shares belonged to NEAG after the bankruptcy of the latter? Why shares were not transferred to Tekhsnabexport?

What do you know about the acquiring of GNSS shares on the auction? Who participated in the auction? Do you know on behalf of whom did these persons act and whose interests did they represent?

I kindly ask you to inform the Prosecutor General's Office of the Russian Federation whether the following persons, namely Mr.Adamov, Evgeny Olegovich, Mr. Pismenny, Vyacheslav Dmitrievich, Mr. Fraishtut, Revmir Georgievich and Mr. Chernov, Alexander Georgievich have the U.S. Citizenship or residence permit.

I assure you that this request does not pursue political goals, nor the purposes other than bringing the person guilty of an economic offence to justice.

The information contained in this request for legal assistance is confidential and restricted since it forms the secrecy of the investigation.

The Procurator General's Office of the Russian Federation undertakes to use any information or documentation provided for the purposes of the pre-trial investigation only, in order to collect evidence related to the criminal case, and not to use it for the purposes other than those specified herein without the consent of the United States of America.

May we present our compliments to you and the willingness to provide similar assistance or help of another kind to the U.S. Department of Justice in the territory of Russia.

I would appreciate it if you could advise the Procurator General's Office of the Russian Federation of the results of review of the request in question.

The Procurator General's Office of the Russian Federation takes this opportunity to renew to the U.S. Department of Justice the assurance of its highest consideration and express the hope for the favorable decision as to our request, which will undoubtedly contribute to strengthening the co-operation between our States in the fight against crime.


Enclosure: in 2 pages


**Deputy Chief**
**Department for Investigation**
**of Major Cases**                    /sign/  E.A. Myasnikov


Translated into English by N. Prasolova

# Extract from the Criminal Code of the Russian Federation

### Article 159. Fraud.

1. Fraud, that is misappropriation of someone else's property or acquisition of the right to someone else's property by means of deceit or abuse of trust,
- is punishable by a fine in the amount of up to 120 thousand roubles, or in the amount of the labor wage or other income of the convicted person for a period of up to 1 year, or by compulsory work for a term up to 180 hours, or by correctional work for a term of from 6 months to 1 year, or by arrest for a term of from 2 to 4 months or by imprisonment for a term of up to 2 years.

2. Fraud, performed by a group of persons by preliminary agreement as well as with infliction of the significant loss upon a citizen,
- is punishable by a fine in the amount of up to 300 thousand roubles, or in the amount of the labor wage or other income of the convicted person for a period of up to 2 years, or by compulsory work for a term of from 180 to 240 hours, or by correctional work for a term of from 1 year to 2 years, or by imprisonment for a term of up to 5 years.

3. Fraud, performed by a person with the use of his official position as well as in large amount,
- is punishable by a fine in the amount of 100 thousand to 500 thousand roubles, or in the amount of the labor wage or other income of the convicted person for a period of from 1 year to 3 years, or by imprisonment for a term of up to 6 years with fine in the amount of up to 10 thousand roubles or in the amount of the labor wage or other income of the convicted person for a period of up to 1 month or without such.

4. Fraud performed by an organized group or in especially large amount,
-is punishable by imprisonment for a term of from 5 to 10 years with fine in the amount of up to 1 million roubles or in the amount of the labor wage or other income of the convicted person for a period of up to 3 years or without such.

### Article 285. Misuse of official powers and authorities

1. Use by public official of his official service-related powers and authorities contrary to the interests of the service, if this action performed out of mercenary or other personal interest and entailed significant violation of rights and lawful interests of citizens or organization or the lawfully protected interests of society or the state,
- is punishable by a fine in the amount of up to 80 thousand roubles, or in the amount of the labor wage or other income of the convicted person for a period of up to 6 months, or by deprivation of the right to hold certain official position or engage in certain activity for a term of up to 5 years, or by arrest for a term of from 4 to 6 months or by imprisonment for a term of up to 4 years.

2. The same action performed by a person holding an official state position in the Russian Federation or the official state position in a subject of the Russian Federation as well as the head of an agency of local government,
- is punishable by a fine in the amount of from 100 thousand to 500 thousand roubles, or in the amount of the labor wage or other income of the convicted person for a period of from 1year to 2 years, or imprisonment for a term of up to 7 years with deprivation of the right to hold certain official position or engage in certain activity for a term up to 3 years or without such.

3. Actions specified by parts one or two of the present Article, entailing grave consequence,
- is punishable by imprisonment for a term of up to 10 years with deprivation of the right to hold certain official position or engage in certain activity for a term of up to 3 years.

**Notes.**

1. "Officials" in the articles of the present Chapter are deemed to be persons who permanently, temporary or by special authority fulfill the function of representative of the authority or those who fulfill organization-management, administrative-economic functions in state agencies, organs of local government, state and municipal institution, as well as in the Armed Forces of the Russian Federation, other troop and military formation of the Russian Federation.

2. In the articles of the present Chapter and other articles of the present Code, persons holding state official positions in the Russian Federation are considered to be persons holding official position established by the Constitution of the Russian Federation, the Federal Constitutional Law and the Federal Laws for direct fulfillment of powers and authorities of the state agencies.

3. In the articles of the present Chapter and other articles of the present Code, persons holding state official positions in the subjects of the Russian Federation are considered to be persons holding official position established by the constitutions and chapters of the subjects of the Russian Federation for direct fulfillment of powers and authorities of the state agencies.

4. State employees and employees of agencies of the local government not related to the officials, bear criminal responsibility under the articles of the present Chapter in cases specially provided by the appropriate articles.

"Copy true"
Deputy Chief
Department for Investigation of Major Cases
Prosecutor General's Office
of the Russian Federation

3rd Class
Justice Adviser                                  I.A. Myasnikov

Translated into English by N. Prasolova

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

IN RE LETTER OF REQUEST )
FROM RUSSIA )
IN THE MATTER OF ) Misc No. 06-
EVGENY ADAMOV )

## ORDER

Upon application of the United States of America; and upon examination of a letter of request from Russia whose authorities are seeking certain testimony and information from individuals which may be found in this District, for use in a judicial proceeding in Russia and the Court being fully informed in the premises, it is hereby

**ORDERED**, pursuant to Title 28, United States Code, Section 1782, that Richard G. Andrews, Assistant United States Attorney, hereby is appointed as Commissioner of this Court and is hereby directed to execute the letter of request from the Russian authorities as follows:

1. to take such steps as are necessary, including issuance of commissioner's subpoenas to be served on persons within the jurisdiction of this Court, to collect the evidence requested;

2. provide notice with respect to the collection of evidence to those persons identified in the requests as parties to whom notice should be given (and no notice to any other party shall be required);

      3. adopt procedures to collect the evidence requested consistent with its use as evidence in a proceeding before a Court in Russia, which procedures may be specified in the request or provided by the Russian authorities;

      4. seek such further orders of this Court as may be necessary to execute this request; and

      5. certify and submit the evidence collected to the Office of International Affairs, Criminal Division, United States Department of Justice, or as otherwise directed by that office for transmission to the Russian authorities.

      IT IS FURTHER ORDERED that, in collecting the evidence requested, the Commissioner may be accompanied by persons whose presence or participation is authorized by the Commissioner.

      Dated:  This _____ day of _____, 2006.

                                    _____
                                      United States District Court Judge